598

In the matter of FIRST AMERICAN HEALTH CARE OF GEORGIA, INC. and its Wholly Owned Subsidiaries, Debtors.

Nos. 96–20188 to 96–20218.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

Aug. 2, 2002.

M. Tyus Butler, Savannah, GA, for debtor.

### MEMORANDUM AND ORDER ON ROBERT J. MILLS'S APPLICATION FOR REIMBURSEMENT

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

This matter, a core proceeding within the jurisdiction of this Court under 28 U.S.C. § 157(b)(1) & (2)(A) & (B), involves a dispute as to who should receive monies remaining in a fund established to pay creditors in accordance with a confirmed Chapter 11 plan of reorganization. There are two contenders: the successors to the debtor corporation, who are entitled to receive any undistributed monies left in the fund at the time the case is closed, and a former officer of the debtor corporation, who has applied for reimbursement of certain legal expenditures to which he believes he is entitled under indemnity agreements or provisions of the plan.

In accordance with Bankruptcy Rule of Procedure 7052(a), I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Robert J. Mills ("Mills") was the CEO of First American Health Care of Georgia ("First American"), which filed a Chapter 11 case on February 21, 1996. Its plan for reorganization ("the Plan") was confirmed on October 4, 1996. Prior to confirmation, First American filed a motion seeking court approval of a settlement agreement between Mills and First American regarding numerous issues ("the Motion"). The Motion recited that the settlement reflected the best interests of debtors, creditors, and parties in interest because litigation of those issues might prevent or delay confirmation of the Plan and completion of the anticipated merger with Integrated Health Services ("IHS"). *See* Ex. 5 (Motion ¶ 6). The Motion also recited that among the numerous claims against First American were unspecified "other financial obligations and future indemnification claims," *id.* ¶ 4. On October 3, 1996, the Court approved the settlement "on the terms and conditions set forth within the omnibus settlement agreement" ("the Omnibus Agreement"), Ex. 5 (Order Approving Settlement), and the Plan was confirmed immediately thereafter.

Mills's claim arose out of two lawsuits. One, the "Broussard Litigation," was filed pre-petition in 1992 in Texas and the other, the "Towne Litigation," was a 1995 pre-petition suit brought in Georgia. The lawsuits, which asserted breach of contract, fraud, and similar causes of action, arose out of alleged breach of acquisition agreements whereby First American acquired local home health care agencies under a contract that provided for certain financial consideration and/or employment contracts for the key employees of the acquired organizations. Mills and First American were named as defendants in both suits.

First American's by-laws provided for indemnification of its officers in the event that they were sued for acts they committed in the course of their employment. In accordance with that provision, First American undertook, in addition to its own defense, Mills's defense in both lawsuits. It continued to provide for Mills's defense after filing its Chapter 11 case and to pay Mills's legal expenses as they were incurred.

Pursuant to the Plan, First American established an escrow account, designated as "Creditor Payment Fund," which was funded in an amount determined at confirmation by this Court to be sufficient to pay the allowed claims of Class 4 creditors. Class 4 claims consisted of

unsecured claims against any Debtor not otherwise classified or treated in this Plan (whether or not liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, absolute, accrued, unaccrued, legal, or equitable), *including without limitation, ... any claims for indemnification, reimbursement, or contribution* by any officers, directors, agents, or employees on account of any claims made against any such person arising out of any facts or conduct occurring prior to the Filing Date .... *Each holder of a claim in this class* is not deemed to be filed pursuant to § 1111(a) ... *must file a proof of claim with regard to such claim* on or before the Claims Bar Date (it being understood that an indemnification, reimbursement, or contribution claim may be preserved with respect to acts, omissions, events or circumstances occurring or existing prior to the Filing Date, even if actual or potential claims, losses, liabilities or expenses have not yet been identified, asserted or incurred, only by expressly stating same in a properly and timely filed proof of claim).

Ex.1 (Plan ¶ 3.04) (emphases added).

The Plan incorporated paragraph 10 of the Omnibus Agreement, which provided in relevant part:

*Future Indemnification.* Except as expressly provided otherwise in the Merger Agreement, and subject to the terms and conditions of this Agreement, the Company agrees to accept responsibility for any liability of the Company (including legal fees and expenses, settlement amounts, and damages, as applicable) incurred in any action in which the Principal Shareholder(s) are made a party to a proceeding solely because he or she was an officer, director or agent of the Company acting on behalf of the Company in a manner he or she believed in good faith to be in the best interests of the Company, so long as such litigation does not result from any action or omission of either Principal Shareholder which could reasonably be found to constitute a crime or fraud and does not pertain to any personal benefit either Principal Shareholder improperly received. The Company shall have the exclusive right to manage and control the defense, settlement or other disposition, payment or discharge of all such matters for which indemnification is provided. The Principal Shareholders will agree to any settlement proposal by the Company and will fully cooperate, at the Company's expense (for out-of-pocket costs thereby incurred) in the defense or prosecution of any such claim. If the Principal Shareholders choose to employ their own counsel to participate in the defense of such matters, they may do so only at their own expense . . . .

Ex. 4 (Omnibus Agreement ¶ 10).

At confirmation or shortly thereafter, First American merged with IHS, as contemplated in the Plan. IHS subsequently merged with or was acquired by other entities which ultimately became a part of a company known as "Medshares." Each of these "successor companies," as they are collectively referenced herein, initially assumed Mills's defense and paid some, but not all, the bills tendered by the two counsel involved. Ultimately, however, the successor companies ceased participating in Mills's defense, first in the Broussard case in the spring of 2000 and then in the Towne litigation in the spring of 2001. The relevant facts of each of the actions are set out below.

## 1. The Towne Litigation

The Towne case was filed in September 1995. At its inception, First American hired counsel to represent its interests and those of Mills. After confirmation, its successor hired Austin Catts as counsel to continue its and Mills's defense and paid Mills's attorney fees in October 1998. Ex. 6. In February 1999 Medshares communicated to Catts that it was assuming the defense. Ex. 7. Catts provided status reports to Medshares from time to time and kept it informed at all times as to the status of the litigation. *See* Exs. 9, 10, 11. At some point, Medshares, without specifically informing Catts that it was no longer affording Mills a defense, stopped paying Catts's statements for services rendered and ceased responding to Catts's communications. As a result, in March 2001 Catts informed Mills that he should hire an attorney to protect his interests in the ongoing litigation. Mills personally hired Catts and attorney Jim Bishop to serve in that role.

Medshares subsequently authorized a settlement for $60,000.00 which was paid from the creditor payment fund in this case as authorized by Order of this Court dated May 23, 2002. Catts testified that although the litigation asserted breach of contract and fraud and sought rescission or the imposition of a constructive trust, it was settled without any admission or establishment of liability for fraud or any criminal activity on the part of Mills. Catts also testified that Mills was named

as a defendant only because he was the person acting on behalf of First American as CEO in arranging a merger with Roger Towne and Tri–County Healthcare. This evidence was uncontradicted.

Mills contends that because (1) the successor companies had assumed his defense, (2) First American never provided Mills with any reservations of rights to deny its liability or indemnity under either the corporate by-laws or under the confirmed plan, and (3) Medshares abandoned his defense and caused him to seek his own counsel, he is entitled to reimbursement as a Class 4 claim under the terms of the Omnibus Agreement.

### 2. The Broussard Litigation

Mills's and First American's defense counsel in the Broussard litigation was James Galbraith, who was initially hired in 1992. After First American filed its Chapter 11 case, the debtor-in-possession hired Galbraith, see Composite Ex. 12 (sub-Ex.1), and paid him $10,500.00 for pre-petition attorney fees, see id. (sub-Ex.2). After confirmation and each succeeding merger, the successor companies routinely contacted Galbraith and assured him that it was their desire to continue to retain him as counsel, as evidenced by IHS's payment of his bills, see id. (sub-Ex.3), by correspondence indicating Medshares was assuming the responsibility for defense of the action, see id. (sub-Ex.4), and by Medshares' authorization to settle the case for $65,000.00 at a prior mediation session in 1999, see id. (sub-Ex.9).

The case spanned a period of time from pre-filing to post-confirmation. Prior to the filing, the case was tried before a jury, which rendered a verdict in favor of Mills and First American. That verdict was appealed. The Texas Court of Appeals remanded the case for another trial because the trial court, due to the illness of the court reporter, was unable to transmit a sufficient transcript of the proceedings on which the appellate court could issue a ruling.

At some point, the successor companies ceased paying Mills's legal bills, at which time Mills authorized Galbraith to seek a writ from the Texas Supreme Court reversing the decision of the Court of Appeals which had remanded the case to trial. The case was ordered to mediation in April 2001. Id. (sub-Ex.14). At the time of the mediation, the successor companies had filed their own Chapter 11 cases, and the Broussard matter was proceeding solely against Mills individually. Galbraith informed MedShares of the mediation and asked for "MedShares' position and if it planned to have a representative in attendance." Id. (sub-Ex.15).

The Broussard case was ultimately settled on Mills's sole authority for $250,000.00, which amount he paid out of his personal funds. At the time of the second mediation, communications with First American's successors had ceased. Mills did not notify the successor companies of the fact or amount of the proposed settlement. Galbraith believed that $250,000.00 was a reasonable settlement amount because the intervening conviction of Mills on criminal charges would have made his defense more difficult at a retrial. Galbraith testified that Mills was named individually as a defendant only because of acts he had taken in his capacity as CEO of First American and that it was never alleged or proved that Mills had engaged in any ultra vires acts. This evidence was uncontradicted.

Mills's total outlay of funds in his defense for which he seeks reimbursement under the terms of the Omnibus Agreement was $369,367.43, which sum included the $250,000.00 settlement amount in the Broussard case in addition to the attorney

fees paid to Catts, Bishop, and Galbraith in the respective amounts of $74,973.37, $16,405.54, and $27,988.52.

## CONCLUSIONS OF LAW

### 1. Proof of Claim

The threshold question is whether the Plan requirements for filing Class 4 claims operate to preclude Mills, as a matter of law, from maintaining a claim for reimbursement due to his failure to file a proof of claim on or before the claims bar date.

 Generally, failure to file a proof of claim by the bar date is fatal to a creditor's right of recovery in a bankruptcy case. *See The Charter Co. v. Dioxin Claimants (In re The Charter Co.)*, 876 F.2d 861, 863 (11th Cir.1989) ("After passage of ... the bar date, the claimant cannot participate in the reorganization unless he establishes sufficient grounds for the failure to file a proof of claim."). Courts have recognized, however, that payment of such a claim is allowable, notwithstanding the lack of a timely filed formal proof of claim, *e.g., id.* at 863–64, where a creditor takes action which amounts to a timely informal proof of claim which "apprise[s] the court of the existence, nature and amount of the claim (if ascertainable) and make[s] clear the claimant's intention to hold the debtor liable for the claim," *id.*

 In this case, the Omnibus Agreement was sufficient as an informal proof of claim because: (1) it was contemplated in the Chapter 11 Plan, *see* Ex. 1 (Plan ¶ 6.11 (captioned "Settlement of Issues Between the Debtors and the Mills Group")); (2) it was a critical linchpin in bringing the Plan to confirmation on October 4, 1996; and (3) it placed First American on notice of Mills's claim.

It is apparent that the purpose of Plan paragraph 3.04, which applied to "officers, directors, agents or employees of the company," *id.* ¶ 3.04, was to ensure that First American had notice of the *existence* of all potential claims, in that the Plan encompassed claims the amount of which might "not yet have been identified, asserted, or incurred," *id.* Since the Omnibus Agreement served to afford First American actual notice of Mills's claim, the claim filing requirement was superfluous.

Furthermore, the Motion to approve the Omnibus Agreement made it clear that approval would facilitate confirmation and ensure a higher dividend to creditors than would permitting the controversy between Mills and his company to proceed over a long period of time to an uncertain end. The Omnibus Agreement provided that the company was obligated, subject to certain conditions, to indemnify Mills for expenses incurred because of litigation to which he had been made a party. Without that indemnification, Mills may not have entered into the Omnibus Agreement, and without the Omnibus Agreement, the then-proposed Plan would likely not have been confirmed.

Therefore, notwithstanding Mills's failure to file a timely proof of claim in accordance with Plan paragraph 3.04, I hold that, so long as Mills's claim fits within the definition of claims for which indemnification was provided in paragraph 10 of the Omnibus Agreement, he is not precluded as a matter of law from asserting and maintaining a claim for reimbursement.

Alternatively, I hold that any ambiguity with respect to whether the company intended to waive Mills's filing of a proof of claim or any conflict between the terms of the Omnibus Agreement and Plan paragraph 3.04 should be resolved against Respondents, whose predecessor was the entity under whose direction the Plan was written. *See* O.C.G.A. § 13–2–2(5) ("If the

construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred."); *cf. also In re Pickering,* 195 B.R. 759, 762–63 (Bankr.D.Mont.1996) ("[A] court must construe any ambiguities with regard to the information-or lack thereof-in a debtor's schedules or statements of affairs against the debtor as both the drafter of the documents and as the party most familiar with the information required by them.").

## 2. Indemnification and Reimbursement

Mills seeks two types of reimbursement: (1) reimbursement of attorney fees and (2) reimbursement of the Broussard settlement payment. For the reasons that follow, I find that he is entitled to full reimbursement of fees paid to his attorneys in the Broussard and Towne cases and partial reimbursement of the Broussard settlement.

### a. Attorney Fees

■ Several limitations applied to First American's obligation to indemnify Mills: (1) any suit as to Mills must have arisen out of conduct which occurred prior to filing, Ex. 1 (Plan ¶ 3.04); (2) such suit must have been regarding actions for which Mills was subject to liability solely because of actions taken in his capacity as First American's CEO, Ex. 4 (Omnibus Agreement ¶ 10); (3) Mills must have cooperated fully in the defense provided for him, *id.;* (4) Mills's actions must not have reasonably constituted a crime or fraud or pertained to an improperly received benefit, *id.;* and (5) no indemnification was to have been provided for fees paid to an attorney of Mills's own choice, *id.*

Mills complied with these terms. First, the evidence was uncontroverted that the law suits were based on actions taken by Mills, prior to filing, in his capacity as CEO, and there is no suggestion that he failed to cooperate in the defense or that the Omnibus Agreement released First American from liability to indemnify Mills. Also, there is no basis for a reasonable belief that Mills's actions in the Broussard and Towne matters were fraudulent or constituted a crime.[1] Finally, Mills did not "choose" his attorney in the manner contemplated in the Omnibus Agreement, in that the successor companies' failure to pay Mills's legal bills, without explanation or justification, constituted a material breach of their obligation under the future indemnification clause to provide legal representation. That breach forced Mills to proceed on his own and hire his own counsel.

I therefore conclude that Mills's claim for attorney fees fits within the definition of claims allowed in Class 4 and that he is entitled to full reimbursement of the fees he paid to his attorneys.

### b. Settlement Payment

■ Respondents contend that, while the future indemnification clause encompassed payments of settlement amounts, Mills's unilateral decision to settle for $250,000.00 without apprising them of the fact or amount of the contemplated settlement was failure to meet a condition for indemnification of that payment. The future indemnification clause entitled the successor companies to "manage and control the defense, settlement or other disposition, payment, or discharge for all ... matters for which indemnification [was]

1. Even though Mills was in fact convicted of criminal activity and has served time in a federal prison for conduct arising out of his management of First American, it has not been contended that any of the counts on which he was convicted related to the transactions with Roger Towne or to those which led to the Broussard litigation.

provided," Ex. 4 (Omnibus Agreement ¶ 10), and that entitlement was expressly characterized as an "exclusive right," *id.* Thus, the issue is whether the successor companies retained the right to "manage and control" with respect to the mediation which resulted in the settlement or whether that right had evaporated as a result of their non-payment of Mills's attorney fees.

Mills contends that the failure of the successor companies to provide for his defense constituted waiver of their rights under the Omnibus Agreement and that, pursuant to authority from the Southern District of Georgia, those entities are now estopped to rely on the provisions of paragraph 10 of that agreement with respect to their exclusive right to manage and control the settlement of the Broussard case.

Mills primarily relies on the decision in *Colonial Oil Indus., Inc. v. Underwriters Subscribing to Policy Nos. T031504670 & T031504671,* 1995 WL 495991 (S.D.Ga. 1995), in which Judge Edenfield cited Georgia caselaw for the following proposition:

> When an insurer denies coverage and absolutely refuses to defend an action against an insured, when it could do so with reservation of rights as to coverage, the legal consequence of such refusal is that it *waives* the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement made in good faith plus expenses and attorneys fees.

*Id.* at *8 (quoting *Ga. S. & Fla. R.R. Co. v. U.S. Cas. Co.,* 97 Ga.App. 242, 244, 102 S.E.2d 500 (1958) (emphasis in original)).

■ This language does not articulate applicable Georgia law. The ultimate outcome of the *Colonial Oil* matter reveals that, notwithstanding an indemnitor's having materially breached a contractual obligation to defend, estoppel does *not* apply to preclude an indemnitor from raising defenses based on terms of its contract with the indemnitee. On appeal of a subsequent opinion by Judge Edenfield reaching the same result, the 11th Circuit reversed. The Court held: "Although the district court correctly concluded that the Underwriters breached their duty to defend, the court erred in holding that the Underwriters were estopped from raising policy defenses to coverage." *See Colonial Oil,* 133 F.3d 1404, 1405 (11th Cir.1998) (reversing 1995 WL 692691 (S.D.Ga.1995), *amended by* 910 F.Supp. 655 (S.D.Ga.1995) (effectively overruling 1995 WL 495991)); *Colonial Oil,* 268 Ga. 561, 561, 491 S.E.2d 337, 338 (1997) (answering question certified by 11th Circuit in *Colonial Oil,* 106 F.3d 960, 966 (11th Cir.1997) ("To what extent does Georgia law estop an insurer from raising coverage defenses after the insurer ... refuses to defend the insured?"), as follows: "[A]n insurer who has wrongfully refused to defend may raise policy defenses to coverage."). The Georgia Supreme Court explained that the rationale for allowing an insurance company, as contractual indemnitor, to raise policy defenses

> is that when the insurer breaches the contract by wrongfully refusing to provide a defense, the insured is entitled to receive only what it is owed under the contract-the cost of defense. The breach of the duty to defend, however, should not enlarge indemnity coverage beyond the parties' contract. This rule, which is the majority position, recognizes that the duty to defend and the duty to pay are independent obligations.

*Colonial Oil,* 268 Ga. at 563, 491 S.E.2d 337. It is clear, therefore, that the decisional language quoted by Mills—as attractive as it is as support for his position—was superceded by the holdings in *Colonial Oil,* 133 F.3d 1404 (11th Cir.

1998), and *Colonial Oil*, 268 Ga. 561, 491 S.E.2d 337 (1997).

■ Mills also contends that the successor companies' failure to pay the attorney fees constituted anticipatory breach which justified Mills's entering into mediation and settling the case without notifying Respondents of the fact of the mediation or the amount of the settlement. "It is a question for the trier of fact as to whether any action of one party is sufficient to constitute a repudiation of the contract and amount to an anticipatory breach." *Jones v. Solomon*, 207 Ga.App. 592, 594, 428 S.E.2d 637, 639 (Ga.App.1993).

■ Contrary to Mills's contention that First American's breach of "the very terms which First American contends bars his entitlement to indemnification" constituted anticipatory breach, Br. of Resp. at p. 6, applicable Georgia law defines "anticipatory breach" in terms which do not encompass this situation. In the first place, the Georgia Supreme Court has emphasized that a finding of "anticipatory breach" requires *absolute and unqualified refusal to perform prior to the time of performance:*

> The "anticipatory repudiation" of a contract occurs when one party thereto repudiates his contractual obligation to perform prior to the time such performance is required under the terms of the contract. Thus, when one party to a bilateral contract of *mutual dependent* promises *absolutely* refuses to perform and repudiates the contract prior to the time of his performance, the innocent party is absolved from any future performance on his part. The breach which will form the basis for an anticipatory breach of contract action is an *unqualified* repudiation of the entire contract prior to the time for performance.

*Coffee Butler Serv., Inc. v. Sacha*, 258 Ga. 192, 193, 366 S.E.2d 672, 673 (Ga.1988)

(first emphasis added, other emphases in original) (internal punctuation omitted); *see also* Black's Law Dictionary 1306 (7th ed. 1999) ("The First Restatement lists three actions that constitute anticipatory repudiation: '(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties; (b) transferring or contracting to transfer to a third person an interest in specific land, goods, or in any other thing essential for the substantial performance of his contractual duties; (c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible.'" (quoting Restatement of Contracts § 318 (1932))).

Three issues arise. The first is whether the successor companies repudiated their obligation to defend Mills with respect to all aspects of his defense, including the settlement negotiations. The evidence does not indicate that the successor companies "absolutely" and "unqualifiedly" refused to participate; nor does the situation fit into the "anticipatory" category, that is, "prior to the time for performance." *See Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1151–52 (5th Cir.1981) (explaining why anticipatory repudiation was "poorly fitted to the facts": "[A]nticipatory repudiation arises when a party unequivocally renounces his duties under a contract prior to the time fixed for his performance. Whatever the act of repudiation . . ., it was here scarcely 'anticipatory.' Both parties had begun performance . . . . Further performance theoretically could have been repudiated . . ., but that situation is properly dealt with as actual, not anticipatory, breach."). Here, respondents participated in Mills's defense for a period of time, but their failure to pay Mills's attorney fees did not constitute an unqualified and abso-

lute refusal to participate in the settlement of the case. They neither expressly renounced any obligation to indemnify or control settlement in advance, nor were they afforded notice or the right to comment, object, or approve when the settlement was finally reached.

The second question is whether Mills's obligation to inform Medshares of the contemplated settlement was excused when the successor companies failed to pay Mills's attorney fees, or, put another way, whether First American's right to participate in a settlement-at least to the extent of being informed that a settlement was imminent, payment of which it was ultimately liable-was waived by its prior breach of its duty to defend. Because "the duty to defend and the duty to pay are independent obligations," *Colonial Oil*, 268 Ga. at 563, 491 S.E.2d 337, I hold that Medshares' rights and Mills's obligation were not extinguished by Medshares prior acts in failing to pay counsel..

The final inquiry is whether the failure to pay Mills's attorney fees was an affirmative act which rendered substantial performance of the successor companies' contractual duties impossible, or apparently impossible. Clearly, that is not the case. While the failure to provide a defense suggested that First American might not authorize or pay a settlement, it did not render its participation impossible.

Mills unilaterally decided to settle the case for $250,000.00. His attorney testified as to the reasonableness of that amount in light of the $1.5 million at stake in the trial on remand and explained that despite the favorable jury verdict in the first trial, Mills's intervening criminal conviction jeopardized the likelihood of success at a retrial. The successor companies, who were then embroiled in their own Chapter 11 cases, may or may not have approved the settlement, or even acknowl-

edged receipt of a demand for approval. We will never know. What is known is that the successor companies were not afforded the opportunity to choose to perform or to breach. Mills will not be fully reimbursed for a settlement he paid without having at least informed the successor companies that settlement was imminent.

■ I conclude that Mills's failure to give First American's successors notice of his intent to settle and an opportunity to object or at least to communicate prior to its consummation unreasonably deprived First American's successors of their right to participate in a settlement and therefore is fatal to Mills's prayer for full reimbursement.

Because, however, Medshares had earlier authorized settlement in the amount of $65,000.00, I hold that authorization to have been the functional equivalent of authorization to settle in that amount after the case was remanded for a new trial. In this case, a $65,000.00 settlement amount had been authorized by Medshares at a time when the settlement value of the case was no greater than the time in question. It is impossible to conceive how, even if notice had been given, Medshares could have failed to approve reauthorization of that amount; indeed, under the circumstances of this case, requiring reauthorization of that amount would not have furthered any worthwhile purpose, *see Jaffe–Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 258 (4th Cir.1984) ("[T]he courts should not require the performance of acts when the doing of them will not further any worthwhile purpose . . . .").

"Equity considers that done which ought to be done and directs its relief accordingly." O.C.G.A. § 23–1–8. I conclude, therefore, that in light of the fact and amounts of the prior settlement offer extended to the Broussard entities, Mills is

entitled to partial reimbursement of his settlement payment in the amount of $65,000.00.

The purpose of the creditor payment fund, the establishment of which was required by the terms of the confirmed plan, *see* Ex. 1 (Plan ¶ 7.01), and in which the reorganized debtor is presently holding more than $450,000.00, was to provide payment of Class 4 general unsecured claims. In that the Omnibus Agreement and the contemporaneous transactions leading to that agreement constitute an informal proof of claim, *see* discussion *supra,* Mills's claim for indemnification is within Class 4. Provided that the creditor payment fund remains solvent, payment of Movant's attorney's fees, together with $65,000.00 of the settlement, will therefore be authorized from that fund.

### ORDER

Robert J. and Margie B. Mills' application for reimbursement of their attorney fees in the amount of $119,367.43 is APPROVED. Their application for reimbursement of the amount paid as settlement in the Broussard case is PARTIALLY GRANTED in the amount of $65,000.00. It is DIRECTED that, in light of the uncertainty as to the insolvency of the creditor payment fund, no remittance be made after this order becomes final until Debtor's counsel stipulates or the Court makes a determination that all remaining, outstanding, unpaid claims against that fund have been satisfied.